**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Oren J. Warshavsky

John W. Moscow

Thomas L. Long

Robertson D. Beckerlegge

Deborah A. Kaplan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | **COMPLAINT** |
| BERNARD L. MADOFF, | |
| Debtor. | |

|  |  |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff,<br><br>        Plaintiff,<br><br>        v.<br><br>PICTET ET CIE; PICTET ASSET MANAGEMENT SA; PICTET CAPITAL SA; PICTET FUNDS SA; PICTET INTERNATIONAL TRUST CORPORATION; PICTET NORTH AMERICA ADVISORS SA; PICTET INVESTMENT SA; PHILIPPE BERTHERAT; RÉMY ANTOINE BEST; RENAUD FERNAND DE PLANTA; JACQUES JOSEPH DE SAUSSURE; BERTRAND FRANCOIS LAMBERT DEMOLE; JEAN-FRANÇOIS DEMOLE; MARC PHILIPPE PICTET; NICOLAS LUCIEN PICTET; IVAN PICTET; CHARLES HENRI PICTET; CLAUDE DEMOLE; GUY ANDRE DEMOLE; PIERRE LARDY; and FABIEN PICTET,<br><br>        Defendants. | Adv. Pro. No. _____ (BRL) |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, for this Complaint against Pictet et Cie; Pictet Asset Management SA; Pictet Capital SA; Pictet Funds SA; Pictet International Trust Corporation; Pictet Investment SA; Pictet North America Advisors SA (together, the "Pictet Entities"); Philippe Bertherat, as general partner of Pictet et Cie, member of the board of directors of Pictet Capital SA, and former president of the board of directors of Pictet North America Advisors SA; Rémy Antoine Best, as a general

partner of Pictet et Cie and president of the board of directors for Pictet Funds SA; Renaud Fernand de Planta, as general partner of Pictet et Cie, chief executive officer and member of the supervisory board of Pictet Asset Management SA, former president of the board of directors of Pictet Funds SA, a member of the board of directors of Pictet Investment SA, and president of the board of directors of Pictet Capital SA; Jacques Joseph de Saussure, as general partner of Pictet et Cie, member of the board of directors of Pictet Capital SA and president of the board of directors of Pictet Investment SA; Bertrand Francois Lambert Demole, as general partner of Pictet et Cie; Jean-François Demole, as general partner of Pictet et Cie; Marc Philippe Pictet, as general partner of Pictet et Cie; Nicolas Lucien Pictet, as general partner of Pictet et Cie, former vice president of the board of directors of Pictet Funds SA, and member of the boards of directors of Pictet Investment SA and Pictet Capital SA; Ivan Pictet, as former general partner of Pictet et Cie and former member of the board of directors of Pictet Capital SA; Charles Henri Pictet, as former general partner of Pictet et Cie and former president of the board of directors of Pictet Capital SA; Claude Demole, as former general partner of Pictet et Cie, former president of the board of directors of Pictet Funds SA, and former member of the board of directors of Pictet Capital SA; Guy Andre Demole, as former general partner of Pictet et Cie and former president of the board of directors of Pictet Capital SA; Pierre Lardy, as former general partner of Pictet et Cie and former vice president of the board of directors of Pictet Capital SA; and Fabien Pictet, as former general partner of Pictet et Cie, (together, "the Pictet Managers") (collectively with the Pictet Entities, the "Pictet Defendants"), alleges the following:

## I.   <u>NATURE OF THE ACTION</u>

1.    This adversary proceeding is part of the Trustee's continuing efforts to avoid

transfers of and recover BLMIS Customer Property[1] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

2.     With this Complaint, the Trustee seeks to recover the equivalent of at least $156,388,398 in subsequent transfers made to the Pictet Defendants.  The subsequent transfers were derived from investments with BLMIS made by Madoff Feeder Funds.  As used herein, the term "Madoff Feeder Fund" refers to an investment vehicle that opened direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS.

3.     At the time when the Pictet Defendants received the subsequent transfers of BLMIS Customer Property, the Pictet Entities comprised one of Switzerland's largest private banks, with assets under management and custody totaling approximately $399 billion.  The Pictet Defendants boast about their expertise in private banking, institutional asset management, fund administration, and global investor services, and claim that they abide by the strictest standards in managing the risks inherent to their business.  The Pictet Defendants knew or should have known of numerous irregularities concerning investing through BLMIS given their background and their own investments in BLMIS.

## II.     <u>JURISDICTION AND VENUE</u>

4.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 544, 547, 548, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), and New York Debtor and Creditor Law §§ 273-279, to obtain avoidable and recoverable transfers

---

[1]     SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

received by the Pictet Defendants as subsequent transferees of funds originating from BLMIS.

5. This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

6. The Pictet Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Madoff Feeder Funds. The Pictet Defendants knowingly received transfers of Customer Property from BLMIS. The Trustee's investigation to date reveals that the Pictet Defendants obtained this money by withdrawing money from: Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro") (collectively the "Kingate Funds"); Vizcaya Partners Limited ("Vizcaya"); Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"), and Fairfield Lambda Limited ("Fairfield Lambda") (collectively the "Fairfield Funds"); and Tremont Group Holdings, Inc. ("Tremont"). The Pictet Defendants were the sole shareholders of a class of shares of Asphalia Fund Limited ("Asphalia") called Asphalia A, which invested substantial sums with Vizcaya, which in turn invested solely with BLMIS. By directing their investments through Asphalia A, which served the dual purpose of funneling money to BLMIS and generating profits therefrom, the Pictet Defendants knowingly accepted the rights, benefits, and privileges of conducting

business and/or transactions in the United States and New York. The Pictet Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

7.      BLMIS maintained an account, number 1FN984, for the Pictet Defendants in New York.

8.      The Pictet Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to N.Y. C.P.L.R. § 302 and Bankruptcy Rule 7004.

9.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (O).

10.      Venue in this District is proper under 28 U.S.C. § 1409.

## III.     BACKGROUND

11.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, inter alia, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

12.      On December 12, 2008 The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

13.      On December 15, 2008 under section 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection

Corporation ("SIPC"). Thereafter, under section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

14. Also on December 15, 2008 Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

> a. appointed the Trustee for the liquidation of the business of BLMIS under SIPA section 78eee(b)(3);
>
> b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA section 78eee(b)(3); and
>
> c. removed the case to this Bankruptcy Court under section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

15. By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009 Madoff was sentenced to 150 years in prison.

17.     On August 11, 2009 a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information.   Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

## IV.     **TRUSTEE'S POWERS AND STANDING**

18.     As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, and this liquidation is well underway.   However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years.   Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

19.     Under SIPA section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

20.     Under SIPA sections 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

21.     The Trustee has standing to bring these claims under section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.      the Pictet Defendants received Customer Property;

b.      BLMIS incurred losses as a result of the claims set forth herein;

c.      BLMIS customers were injured as a result of the conduct detailed herein;

d.      SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for their losses;

e.      the Trustee will not be able to fully satisfy all claims;

f.      the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

g.      the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date, the Trustee has received multiple, express unconditional assignments of applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury in fact and a distinct loss for which the Trustee is entitled to reimbursement in the form of monetary damages; the Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew;

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.  the Trustee has the power and authority to avoid and recover transfers under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.   THE DEFENDANTS

22.   Defendant Pictet et Cie is a partnership that operates as a Swiss private bank, headquartered and maintaining a place of business at Route des Acacias 60 CH-1211 Geneva 73, Switzerland.

23.   Defendant Pictet Asset Management SA, a joint stock company that functions as an asset manager and the institutional banking arm of Pictet et Cie, maintains a place of business at Route des Acacias 60 CH-1211 Geneva 73, Switzerland.

24.   Defendant Pictet Funds SA is a joint stock company and asset manager maintaining a place of business at Route des Acacias 60 CH-1211 Geneva 73, Switzerland.

25.   Defendant Pictet International Trust Corporation is a trust company maintaining a place of business at Route des Acacias 60 CH-1211 Geneva 73, Switzerland.

26.   Defendant Pictet North America Advisors SA is a joint stock company and investment manager maintaining a place of business at Route des Acacias 48, 1227 Carouge, Geneva, Switzerland.

27.   Defendant Pictet Capital SA is a joint stock company and management investment office maintaining a place of business at Route de la Capite 13, c/o Renaud de Planta, 1223 Cologny, Switzerland.

28.   Defendant Pictet Investment SA is a joint stock company and financial institution maintaining a place of business at Route de la Capite 13, c/o Renaud de Planta, 1223 Cologny, Switzerland.

29.     Defendant Philippe Bertherat is a general partner of Pictet et Cie, a member of the board of directors of Pictet Capital SA, and the former president of the board of directors of Pictet North America Advisors SA.  Upon information and belief, Philippe Bertherat maintains a residence in Anières, Switzerland.

30.     Defendant Rémy Antoine Best is a general partner of Pictet et Cie and the president of the board of directors for Pictet Funds SA.  Upon information and belief, Rémy Antoine Best maintains a residence in Jussy, Switzerland.

31.     Defendant Renaud Fernand de Planta is a general partner of Pictet et Cie, the chief executive officer and member of the supervisory board of Pictet Asset Management SA, former president of the board of directors of Pictet Funds SA, a member of the board of directors of Pictet Investment SA, and president of the board of directors of Pictet Capital SA.  Upon information and belief, Renaud Fernand de Planta maintains a residence in Cologny, Switzerland.

32.     Defendant Jacques Joseph de Saussure is a general partner of Pictet et Cie, a member of the board of directors of Pictet Capital SA and president of the board of directors of Pictet Investment SA.  Upon information and belief, Jacques Joseph de Saussure maintains a residence in Geneva, Switzerland.

33.     Defendant Bertrand Francois Lambert Demole is a general partner of Pictet et Cie and upon information and belief maintains a residence in Versoix, Switzerland.

34.     Defendant Jean-François Demole is a general partner of Pictet et Cie and upon information and belief maintains a residence in Founex, Switzerland.

35.     Defendant Marc Philippe Pictet is a general partner of Pictet et Cie and upon information and belief maintains a residence in Gland, Switzerland.

36.     Defendant Nicolas Lucien Pictet is a general partner of Pictet et Cie, former vice president of the board of directors of Pictet Funds SA, and a member of the boards of directors of Pictet Investment SA and Pictet Capital SA.  Upon information and belief, Nicolas Lucien Pictet maintains a residence in Troinex, Switzerland.

37.     Defendant Ivan Pictet is a former general partner of Pictet et Cie and a former member of the board of directors of Pictet Capital SA.  Upon information and belief, Ivan Pictet maintains a residence in Anières, Switzerland.

38.     Defendant Charles Henri Pictet is a former general partner of Pictet et Cie and former president of the board of directors of Pictet Capital SA.  Upon information and belief, Charles Henri Pictet maintains a residence in Collonge-Bellerive, Switzerland.

39.     Defendant Claude Demole is a former general partner of Pictet et Cie, former president of the board of directors of Pictet Funds SA, and a former member of the board of directors of Pictet Capital SA.  Upon information and belief, Claude Demole maintains a residence in Chambésy, Switzerland.

40.     Defendant Guy Andre Demole is a former general partner of Pictet et Cie and a former president of the board of directors of Pictet Capital SA.  Upon information and belief, Guy Andre Demole maintains a residence in Cologny, Switzerland.

41.     Defendant Pierre Lardy is a former general partner of Pictet et Cie and former vice president of the board of directors of Pictet Capital SA.  Upon information and belief, Pierre Lardy maintains a residence in Vandoeuvres, Switzerland.

42.     Defendant Fabien Pictet is a former general partner of Pictet et Cie and upon information and belief maintains a residence in the United Kingdom.

43.     Upon information and belief, the Pictet Entities collectively function as one entity for all of the purposes herein.

## VI.     THE PONZI SCHEME

44.     BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading, and investment advisory.

45.     Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies.  Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

46.     The second part of the SSC Strategy was the hedge of Madoff's stock purchases with options contracts.  Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.  Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding treasury

bills. Madoff also told customers that these "round-trips" into the market would occur between six and ten times each year.

47. BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the split strike conversion strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for IA Business' customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxx703.

48. Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

49. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

50.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS Accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

51.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

52.    Madoff's scheme continued until December 2008 when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

53.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

54.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value

of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## VII.    THE PICTET DEFENDANTS ARE SIGNIFICANT PLAYERS IN THE GLOBAL PRIVATE BANKING AND INVESTMENT INDUSTRY AND THUS WERE ON INQUIRY NOTICE OF MADOFF'S FRAUDULENT ACTIVITY

55.    According to the Pictet website, the Pictet Entities comprise one of Switzerland's largest private banks, with assets under management and custody totaling $399 billion at the end of December 2010.  The website boasts the Pictet Defendants' expertise in private banking, institutional asset management, fund administration and global investor services.  Further, the Pictet Defendants claim to abide by the strictest standards in managing the risks inherent to their business, always acting in the best interests of clients.  In managing those risks, the Pictet Defendants purport to use risk monitoring tools and provide investors with both regular and ad hoc reports with the highest level of transparency.  See Exhibit A.

56.    The Pictet Defendants' marketing materials describe their Manager Selection Services ("MSS") department as one that combines global investment expertise with the experience and know-how of the world's leading asset managers.  The MSS team claims to foster long-term relationships with the top leaders in the hedge fund industry.  MSS maintains a list of over 80 hedge funds that successfully meet all the requirements of their due diligence process.  See Exhibit B.

57.    According to its website, Pictet & Cie is owned by eight managing partners, the Pictet Managers, who are personally and entirely liable for all of the bank's commitments.  See Exhibit A.

58.    The Pictet Defendants' expertise in private banking, institutional asset management, fund administration, and global investor services, as well as their substantial

investments in the Madoff Feeder Funds, provided them with access to information about the operations of BLMIS, and therefore they knew or should have known of numerous irregularities concerning investing through BLMIS.

## VIII.  THE TRANSFERS

59.     The Pictet Defendants received subsequent transfers from Madoff Feeder Funds that are not named as defendants herein, including the Kingate Funds, Vizcaya, the Fairfield Funds, and Tremont – each of which maintained one or more accounts with BLMIS.

### A.     THE KINGATE FUNDS

#### 1.     INITIAL TRANSFERS FROM BLMIS TO KINGATE GLOBAL

60.     The Trustee has filed an action against the Kingate Funds to avoid and recover initial transfers of Customer Property, styled as *Picard v. Kingate, et al.*, No. 08-1789 (BRL), Adv. Pro. No. 09-1161 (BRL) (the "Kingate Complaint").  The Trustee incorporates by reference the allegations contained in the Kingate Complaint as if fully set forth herein.

61.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global of approximately $398,704,065 (the "Kingate Global Six Year Initial Transfers").  The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

62.     The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers").  The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550,

and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

63.　　The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

64.　　The Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts detailing these transactions are included as Exhibits C and D.

### 2.　　SUBSEQUENT TRANSFERS FROM KINGATE GLOBAL TO THE PICTET DEFENDANTS

65.　　Based on the Trustee's investigation to date, approximately $17,160,134 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to the Pictet Defendants (the "Kingate Global Subsequent Transfers"). Charts setting forth the presently known Kingate Global Subsequent Transfers are attached as Exhibit E.

66.　　The Kingate Complaint seeks to avoid and recover the Kingate Global Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

67.　　As set forth in paragraph 65 of this Complaint, a portion of the Kingate Global

Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the Bankruptcy Code.

68.     The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3.     INITIAL TRANSFERS FROM BLMIS TO KINGATE EURO

69.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro of approximately $475,485,759 (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

70.     The Kingate Euro Six Year Initial Transfers include approximately $248,979,674 which BLMIS transferred to Kingate Euro during the two years preceding the Filing Date (the "Kingate Euro Two Year Initial Transfers"). The Kingate Euro Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

71.     The Kingate Euro Two Year Initial Transfers include approximately $155,606,833 which BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers"). The Kingate Euro Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4)

19

and are avoidable, should be avoided, and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

72.     The Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers are collectively defined as the "Kingate Euro Initial Transfers."  Charts setting forth these transfers are included as Exhibits F and G.

73.     The Kingate Global Initial Transfers and the Kingate Euro Initial Transfers are collectively referred to as the "Kingate Initial Transfers."

**4**.     **SUBSEQUENT TRANSFERS FROM KINGATE EURO TO THE PICTET DEFENDANTS**

74.     Based on the Trustee's investigation to date, the equivalent of at least $14,051,845 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to the Pictet Defendants (the "Kingate Euro Subsequent Transfers"). A chart setting forth the presently known Kingate Euro Subsequent Transfers is attached as Exhibit H.

75.     The Kingate Complaint seeks to avoid and recover the Kingate Euro Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

76.     As set forth in paragraph 74 of this Complaint, a portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the Bankruptcy Code.

77.     The Trustee's investigation is on-going and the Trustee reserves the right to:  (i)

supplement the information on the Kingate Euro Initial Transfers, Kingate Euro Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

78. The Kingate Global Subsequent Transfers and the Kingate Euro Subsequent Transfers are collectively referred to as the "Kingate Subsequent Transfers."

**B. VIZCAYA**

**1. INITIAL TRANSFERS FROM BLMIS TO VIZCAYA**

79. The Trustee has obtained a judgment in the action styled as *Picard v. Vizcaya, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 09-1154 (the "Vizcaya Complaint"), avoiding the initial transfers set forth below from BLMIS to Vizcaya. The Trustee incorporates by reference the allegations contained in the Vizcaya Complaint as if fully set forth herein.

80. During the two years preceding the Filing Date, BLMIS made transfers to Vizcaya of approximately $180,000,000 (the "Vizcaya Two Year Initial Transfers"). The Vizcaya Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), have been avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

81. The Vizcaya Two Year Initial Transfers include approximately $150,000,000 which BLMIS transferred to Vizcaya during the 90 days preceding the Filing Date (the "Vizcaya Preference Period Initial Transfers"). The Vizcaya Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), have been avoided, and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

82. The Vizcaya Two Year Initial Transfers and the Vizcaya Preference Period Initial Transfers are collectively defined as the "Vizcaya Initial Transfers." Charts setting forth these

transfers are included as Exhibits I and J.

83.    On August 6, 2010, the Vizcaya Initial Transfers were avoided and judgment was entered against Vizcaya for $180,000,000 and against subsequent transferee Asphalia for $67,000,000.  *Picard v. Vizcaya, et al.*, Adv. Pro. No. 09-1154, Docket Nos. 49, 51, attached as Exhibit W.  The Trustee has not yet recovered any of the avoided transfers.

### 2.    SUBSEQUENT TRANSFERS FROM VIZCAYA TO ASPHALIA AND SUBSEQUENTLY TO THE PICTET DEFENDANTS

84.    Based on the Trustee's investigation to date, approximately $67,000,000 of the $150,000,000 transferred from BLMIS to Vizcaya during the 90 days preceding the Filing Date was subsequently transferred by Vizcaya to Asphalia.  Ultimately, approximately $65,000,000 of the $67,000,000 was transferred by Asphalia to the Pictet Defendants (the "Vizcaya Subsequent Transfers").  Charts setting forth the presently known Vizcaya Subsequent Transfers are included as Exhibits K and L.

85.    Pursuant to sections 547, 548, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), the Vizcaya Initial Transfers were avoided on August 6, 2010 when a judgment was entered against, *inter alia*, Vizcaya and Asphalia.

86.    As set forth in paragraph 84 of this Complaint, a portion of the Vizcaya Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the Bankruptcy Code.

87.    The Trustee's investigation is on-going and the Trustee reserves the right to:  (i) supplement the information on the Vizcaya Initial Transfers, Vizcaya Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### C.     FAIRFIELD

#### 1.     INITIAL TRANSFERS FROM BLMIS TO FAIRFIELD SENTRY

88.     The Trustee filed an action against Fairfield Sentry to avoid and recover initial transfers of Customer Property, styled as *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (the "Fairfield Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Complaint as if fully set forth herein.

89.     During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Six Year Initial Transfers"). The Fairfield Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and sections 273-279 of New York and Debtor and Creditor Law.

90.     The Fairfield Six Year Initial Transfers include approximately $1.6 billion that BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Two Year Initial Transfers"). The Fairfield Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

91.     The Fairfield Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Preference Period Initial Transfers"). The Fairfield Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

92. The Fairfield Six Year Initial Transfers, the Fairfield Two Year Initial Transfers, and the Fairfield Preference Period Initial Transfers are collectively defined as the "Fairfield Initial Transfers." Charts setting forth these transfers are included as Exhibits M and N.

**2. SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO THE PICTET DEFENDANTS**

93. Based on the Trustee's investigation to date, approximately $50,386,685 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to the Pictet Defendants (the "Sentry-Pictet Subsequent Transfers"). A chart setting forth the presently known Sentry-Pictet Subsequent Transfers is attached as Exhibit O.

94. The Fairfield Complaint seeks to avoid and recover the Fairfield Sentry Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

95. As set forth in paragraph 93 of this Complaint, a portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the Bankruptcy Code.

96. The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Initial Transfers, Sentry-Pictet Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**3. SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO FAIRFIELD SIGMA AND SUBSEQUENTLY TO THE PICTET DEFENDANTS**

97. Based on the Trustee's investigation to date, approximately $752,273,917 of money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield

Sentry to Fairfield Sigma. Thereafter, the equivalent of approximately $9,340,250 was transferred by Fairfield Sigma to the Pictet Defendants (the "Sentry-Sigma Subsequent Transfers"). Charts setting forth the presently known Sentry-Sigma Subsequent Transfers are attached as Exhibits P and Q.

98. The Fairfield Complaint seeks to avoid and recover the Fairfield Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

99. As set forth in paragraph 97 of this Complaint, a portion of the Fairfield Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the Bankruptcy Code.

100. The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Initial Transfers, Sentry-Sigma Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**4. SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO FAIRFIELD LAMBDA AND SUBSEQUENTLY TO THE PICTET DEFENDANTS**

101. Based on the Trustee's investigation to date, approximately $52,935,000 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Lambda. Thereafter, the equivalent of approximately $361,194 was subsequently transferred by Fairfield Lambda to the Pictet Defendants (the "Sentry-Lambda Subsequent Transfers"). Charts setting forth the presently known Sentry-Lambda Subsequent Transfers are attached as Exhibits R and S.

102. The Fairfield Complaint seeks to avoid and recover the Fairfield Six Year Initial

Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

103.    As set forth in paragraph 101 of this Complaint, a portion of the Fairfield Six Year Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the Bankruptcy Code.

104.    The Trustee's investigation is on-going and the Trustee reserves the right to:  (i) supplement the information on the Fairfield Six Year Initial Transfers, Sentry-Lambda Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

105.    The Sentry-Pictet Subsequent Transfers, the Sentry-Sigma Subsequent Transfers and the Sentry-Lambda Subsequent Transfers, are collectively defined as the "Fairfield Subsequent Transfers."

**D.    TREMONT**

**1.    INITIAL TRANSFERS FROM BLMIS TO TREMONT**

106.    The Trustee filed a complaint against Tremont to avoid and recover initial transfers of Customer Property, styled as *Picard v. Tremont, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 10-05310 (the "Tremont Complaint").  The Trustee incorporates by reference the allegations contained in the Tremont Complaint as if fully set forth herein.

107.    During the six years preceding the Filing Date, BLMIS made transfers to Tremont of $1.9 billion (the "Tremont Six Year Initial Transfers").  The Tremont Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the

Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

108. The Tremont Six Year Initial Transfers include approximately $959,632,360 which BLMIS transferred to Tremont during the two years preceding the Filing Date (the "Tremont Two Year Initial Transfers"). The Tremont Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

109. The Tremont Six Year Initial Transfers and the Tremont Two Year Initial Transfers are collectively defined as the "Tremont Initial Transfers." Charts demonstrating those transfers are included as Exhibits T and U.

### 2. SUBSEQUENT TRANSFERS FROM TREMONT TO THE PICTET DEFENDANTS

110. Based on the Trustee's investigation to date, approximately $88,290 of the money transferred from BLMIS to Tremont was subsequently transferred by Tremont to the Pictet Defendants (the "Tremont Subsequent Transfers"). A chart setting forth the presently known Tremont Subsequent Transfers is attached as Exhibit V.

111. The Tremont Complaint seeks to avoid and recover the Tremont Initial Transfers pursuant to sections 544, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

112. As set forth in paragraph 110 of this Complaint, a portion of the Tremont Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Pictet Defendants and is recoverable from the Pictet Defendants pursuant to section 550 of the

Bankruptcy Code.

113.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Tremont Initial Transfers, Tremont Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE
## RECOVERY OF SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551

114.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

115.    The Trustee has filed lawsuits against the Kingate Funds, Fairfield Sentry, and Tremont to avoid and recover the Kingate Initial Transfers, Fairfield Initial Transfers, and Tremont Initial Transfers pursuant to sections 544, 547(b), 548, and 550 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

116.    Each of the Kingate Initial Transfers, Fairfield Initial Transfers, and Tremont Initial Transfers are avoidable under sections 544, 547, and 548 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and SIPA § 78fff-2(c)(3).

117.    The Pictet Defendants received the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers, totaling the equivalent of approximately $91,388,398, which are recoverable pursuant to Section 550 of the Bankruptcy Code.

118.    Each of the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Pictet Defendants.

119.    The Pictet Defendants are immediate or mediate transferees of the Kingate Initial

Transfers, Fairfield Initial Transfers, and Tremont Initial Transfers.

120.     As a result of the foregoing, pursuant to section 550 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Pictet Defendants recovering the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## RECOVERY OF SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550(a) AND 551

121.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

122.     The Trustee has obtained a judgment avoiding the Vizcaya Initial Transfers pursuant to sections 547, 548, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

123.     The Pictet Defendants received the Vizcaya Subsequent Transfers, totaling approximately $65,000,000, which are recoverable pursuant to Section 550(a) of the Bankruptcy Code.

124.     Each of the Vizcaya Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Pictet Defendants.

125.     The Pictet Defendants are immediate or mediate transferees of the Vizcaya Initial Transfers.

126.     As a result of the foregoing, pursuant to section 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and given that the Vizcaya Initial Transfers are avoided, the Trustee is entitled to a judgment against the Pictet Defendants recovering the Vizcaya Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Pictet Defendants as follows:

(a)     On the First Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Pictet Defendants recovering the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $91,388,398, for the benefit of the estate of BLMIS;

(b)     On the Second Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Pictet Defendants recovering the Vizcaya Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $65,000,000, for the benefit of the estate of BLMIS;

(c)     Awarding the Trustee all applicable attorneys' fees, interest, costs, and disbursements of this action; and

(d)     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: New York, New York
        April 7, 2011

                                        /s/ Oren J. Warshavsky
                                        **Baker & Hostetler LLP**
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: (212) 589-4200
                                        Facsimile: (212) 589-4201
                                        David J. Sheehan
                                        Email: dsheehan@bakerlaw.com
                                        Oren J. Warshavsky
                                        Email: owarshavsky@bakerlaw.com
                                        John W. Moscow
                                        Email: jmoscow@bakerlaw.com
                                        Robertson D. Beckerlegge
                                        Email: rbeckerlegge@bakerlaw.com
                                        Deborah A. Kaplan
Of Counsel:                             Email: dkaplan@bakerlaw.com

**Baker & Hostetler LLP**               **Baker & Hostetler LLP**
45 Rockefeller Plaza                    65 East State Street, Suite 2100
New York, New York 10111                Columbus, Ohio 43215
Telephone: (212) 589-4200               Telephone: (614) 228-1541
Facsimile: (212) 589-4201               Facsimile: (614) 462-2616
Michelle R. Kaplan                      Thomas L. Long
Email: mkaplan@bakerlaw.com             Email: tlong@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee*
                                        *for the Substantively Consolidated SIPA*
                                        *Liquidation of Bernard L. Madoff Investment*
                                        *Securities LLC and Bernard L. Madoff*